The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. We'll now hear argument in number 19-1602 Echo Services, LLC v. Certified Aviation Services, LLC. Mr. Weinberg. Good morning. Jonathan Weinberg for Appellant Cass. May it please the court. Cass was found to infringe the 2-6-2 patent because it uses a keypad for selecting a type of engine and a computer for watching the engine accordingly. That claim scope is overbroad, it's ineligible, and it's entirely obvious. These are three alternative grounds for reversal and I'd like to start with the threshold issue of eligibility. Our argument here is that under the scope necessary to support the verdict, the claims are ineligible because they recite a generic machine that washes something, here it happens to be a turbine engine, based on its type. The structure recited is entirely generic, a washing unit coupled with a computer and a keypad. The process, equally generic. You determine the engine type, get the corresponding parameters, and wash the engine accordingly. In fact, this process and structure is so generic that if one replaces the phrase turbine engine with the word laundry, these claims are a perfect read on my washing machine at home. So the law, at least to this respect, is clear. Counsel, are you saying your washing machine at home is an abstract idea? No, I'm saying that the claims here are so broad because they capture any kind of washing machine. So the washing machine at home, the washing machine that's being used to wash jet engines, pretty much any machine or the idea of any machine that washes something according to its type is captured by these claims. Are broad claims necessarily ineligible? Well, the eligibility analysis does concern preemption. And this court's holdings have been pretty clear in cases like McCrow that the bare idea of automating something is ineligible, whereas a specific structure or specific process to achieve that automation would be eligible. So the question in this case is does this claim recite any specific structure or any specific process, or does it just recite this goal, this desire to automate what was a conventional process? And if you go through the structure and the process here, it's entirely generic. That is common to any solution for washing engines according to their type. Is there any dispute here as to whether the washing methodology recited in the claim was conventional and well-known before this patent? So the washing methodology, again, is just determining the engine type, getting the corresponding parameters, and washing using the parameters. Now, that can't supply an inventive concept for two reasons, one of which you just touched on, because it's conventional. But the other one is even if it were not conventional, it's abstract. It's just the process of washing something by its type, which is an abstract concept. And steps that do nothing more than spell out the abstract idea are ineligible. We've seen that in Ultramershal and the Capital One case. Now, as an alternative ground, even if it were not abstract, it's also entirely conventional. We've reached the fact issue, which we don't have to under BSG. Yeah, but my question to you is, is there any dispute between the parties as to whether it was conventional and well-known, or is that agreed? The briefing from Ecoservices says that there is a dispute about this. We don't think that it was disputed below, and certainly the district court specifically called it a conventional human-automated process. Ecoservices hasn't argued that that fact-finding is clearly erroneous or lacks any kind of evidence. They've simply said that this is a fact issue that the court shouldn't have reached. They haven't supported that, and if we need to use conventionality to show that this conventional process was not an inventive concept, we can do that. But the court need not reach that question, because watching something according to its type is itself abstract, and therefore it cannot provide an inventive concept. Well, the methodology with respect to the other patent no one disputes was unconventional. Is there anything in this patent that says that the methodology that is being employed is the same as that in the method patent? The 860 patent is a completely separate patent from the 262. The 262 doesn't require any kind of spraying with atomized water. It doesn't say anything about the spray characteristics. Again, it's just a three-piece claim that says a washing unit, which is anything that provides washing liquid, connected to a computer, and connected to a keypad, or any kind of interface, really, not just a keypad. And there's no dispute that these three components were known, generic, and that the configuration of them, which is that they're just connected to one another, is generic structure. In fact, the verdict here rests entirely on the function, not the structure. The expert testified that he never opened up the machine. He never examined the hardware or the software. He only, quote, witnessed what it does. And what it does is exactly what human operators always had done, determine the engine type, get the corresponding parameters, and wash using those parameters. Why isn't this, though, as the district court found, like McCrow, where the problem was is that before it was mechanized, it was subject to human error? Well, the district court misread McCrow. McCrow was a case where specifically, and a quote from McCrow, that unlike cases where the same computer-automated process and the prior art methods were carried out in the same way, in McCrow, the human operators used their own subjective determinations, and that was replaced with a computer system that used a specific set of objective rules. And that was found eligible exactly because that computerized method with those specific rules was different than what human operators always had done, which is to use subjective determinations. And that's why both parties agree that McCrow is directly on point here, and we think it's dispositive. It lays out exactly what the proper legal framework is, and it shows that this case is unlike McCrow. Unless my colleagues have further questions about this patent, could you turn to the 860 patent? Of course. Ecoservices won infringement in the 860 patent based on a theory that is facially wrong and that it won't even defend an appeal. That alone demands J-MOL of non-infringement. And on appeal, Ecoservices presents an entirely new theory, but that theory is also wrong and it's indefinite. And because Ecoservices fails to identify any definite reading of the claim under which evidence would show infringement, the claims are either indefinite or they're not infringed. The way I read the briefs from both sides, it looks as though you agree that the claim should be interpreted as requiring a sufficient quantity of these small particles to efficiently and effectively wash the engine. And if that is the claim construction, and I'm not sure that there's a difference between the parties about that, why is the claim indefinite? So I think that this got a little bit confused in the briefing. This is not our position. What claim one recites is spraying, quote, a total volumetric flow, 0.5 to 60 liters per minute, at the given range of particle sizes. And that's what has to be sprayed. So the infringement question is, does cycling infringe if it satisfies the volume limitation, but fewer than 35% of the particles are in the range? And the answer can't be that what this claim requires is just to spray whatever would be effective. If that were the case, then the claim would have just recited, spray whatever amount is necessary to wash the engine. On page 50 of your brief, you say the specification also identifies various objects of the present invention, including washing effectively with far less quantities of liquid. The particle size limitation must therefore be interpreted to promote these objects of the invention. Isn't that a statement that the claim should be interpreted to have an effective and efficient washing limitation? No, it's a statement saying that whatever interpretation of this particle size limitation is, it should advance the objects of the invention. This is slightly different than what Ecoservices is saying. Ecoservices is saying that the particular criteria don't matter at all so long as you advance this one objective, right? So they're removing the claim language before we study criteria altogether. Let's assume for the moment that we conclude that the construction of the claim is that you have enough of these small particles to effectively and efficiently wash the engine. Why would that be indefinite? Well, I'll answer the question. It has three issues. It's new, it's wrong, and it's indefinite. And here's why. To answer that third question, why is it indefinite, it's because there's no evidence in the record whatsoever that an artisan could translate that effectiveness objective into an objective boundary with which to answer the infringement question. But isn't the burden on you to show that someone skilled in the art couldn't figure it out? Well, that's for indefinite, that's right. But there has to be, this is a new question, this is a new interpretation presented on appeal for the first time. And that's why there's no actual evidence interpreting it because this was not a theory that Ecoservices presented at all. But you never asked for a construction of this claim, did you, of this limitation? Well, the parties agreed that the construction would be ordinary meaning. And so it was Ecoservices' infringement burden to show that under the ordinary meaning there was sufficient evidence here to show an infringement. And they didn't do that because they voted an interpretation of the ordinary meaning that they won't even defend here on appeal. So I see I'm well into my rebuttal time. And if you have more questions on this issue, I'm happy to reserve the rest for rebuttal. Okay. If there are no further questions, I'll sit down. All right, Mr. Jay. Good morning, Your Honors. May it please the Court, William Jay from Goodwin Proctor for Ecoservices. My friends on the other side have raised, I think, at least five different issues in their brief. The argument is so far focused on two, and I'll turn primarily to those. But, of course, I'm happy to answer any questions that the Court may have about the other issues. Let's start with the 860 since we were just talking about that. Do you agree that the construction is effectively and efficiently washed the engine? That's what you seem to say in your red brief. That's the construction for the claim as a whole. In other words, that is what is required to infringe. The other side says that it's the particle size limitation that's indefinite. And they say that it can't mean what it means as a matter of plain language. In other words, that there are particles that are within that quite precise range because that would not practice the invention. That would not effectively and efficiently clean the engine. And that is built into the method, as Your Honor's question recognizes. So the reason that the other side's indefiniteness argument is wrong is that it focuses on how many particles meet the particle size limitation, while ignoring the efficiently clean the engine part of the claim. So, yes, we agree that that's the right way to look at the method. That is what was proved at trial with the testing that our expert did, demonstrating that it's by no means a single particle in the Cyclene system that meets the particle size limitation. But a substantial number of particles ranging between 15% and 35% of all particles sprayed at the given parameters. And that was- But I don't see that either expert addressed the question of whether someone skilled in the art would know the particle range and the quantity to use within that range. Well, I think as one of the court's questions recognized, this was not a disputed issue at trial because the parties had not raised an indefiniteness challenge to this at the time of trial. So the experts were not asked to specifically opine about the definiteness of the particle size limitation. But the district court recognized that at trial, the experts were able to apply the particle size limitation in the testing, for example, that our expert did, measuring whether the particles met that particle size limitation, and then going on to assess whether the Cyclene system practices the invention as a whole, like the full claimed method, because the particles in Cyclene follow the gas path through the turbine, which is what the claim recites as the degree to which the particles of liquid are finally divided. So I do want to respond to my friend's point that this is a quote-unquote new construction. We've always taken the position that within the range of 250 to 120 micrometers means what it says. My friends say that it can't mean what it says because we don't know how many particles must be at that size. And they've repeatedly gone back to the one particle hypothetical. But the point that I think they miss, and that is consistent in our construction from the very beginning, is that to practice the invention, you have to practice all of the limitations of the invention, not just the particle size limitation. And that includes being finally divided to a degree at which the particles of liquid will follow the same route through the turbine compressor as those previously taken by the contaminants. And that is demonstrated not only by our experts' testimony, but also by the engineering order that's in the record and by another document from CAS demonstrating that in its system, the fine mist follows the gas path through the turbine. Unless the court has other questions about the 860, I will turn to the 262 patent. Okay. Go ahead. Thank you. On the question of subject matter eligibility under Section 101, this is not a patent that preempts the abstract idea of washing something according to its type. It doesn't even preempt the idea of washing a turbine engine according to its type because, after all, this is an automated process, and that is what differentiated this process from what came before. There were various manual ways of washing engines according to their type, but what this system in combination allows is for the parameters that are specific to an engine, an engine type, to actually control the operation of the system. And I think I would refer the court, in particular, to the discussion of the specification in Column 7, starting at Line 12, discussing how the control unit directs the opening of one or more valves, and then later on in that paragraph, is configured to regulate a washing time for the particular engine being washed. And that washing time, of course, is a limitation that is reflected in Claim 9. Counsel, why isn't this case more like Chamberlain than it is like McGrow? I think, Your Honor, that it's like McGrow because it is an automation of something that was previously done by people. The automation solves a particular problem, and I think that's discussed both in the specification at 356 and 442, and then also by the District Court at page 12 of the appendix, discussing the inventor's testimony and even the plaintiff's expert's testimony about the particular problems relating to human error in this field. And by that, I mean the fact that aircraft engines are being washed by individuals, often late at night, often in the dark, and that automation dealt with that problem by avoiding human error. It also adds a degree of precision that makes possible the types of measurement of volumetric flow that, not in the claims of this patent, but in other claims that are issued from the same specification, and you can see the discussion in the specification from columns 7 to 8, that deal with the measurement of contaminants in the wastewater. But isn't there a problem that we have to look at the claims? Yes, the specification informs the claims, but it's the claims that we have to determine eligibility based on, right? Of course that's right, Judge O'Malley, and the claims don't just recite a generic control unit. They recite that the control unit is configured to regulate the washing unit according to washing parameters associated with the particular washing program, and the washing program has to be based on the engine type. And so that is what's different between this claim, I should say these claims, and the prior art, that there wasn't previously this type of automation in this field, and I think that that's what separates it. It also is what demonstrates that the other side's formulation, that this is the idea of washing an engine according to its type. That's not what these claims are directed to because of the automation element. A, I mean, my client does washes that are operator directed rather than controlled by a control unit, and I understand that CAS may well do the same. So this isn't preempting every way of making a judgment about engine type and directing a wash accordingly, but it is automating it, and it is giving control of particular variables, including time, to the control unit so that the wash doesn't go on too long, it doesn't rest on kind of human estimation. And to analogize to McCrow, the question in McCrow was whether creating types of rules like this was good enough to make eligible a process that automated a task that humans were capable of performing, at least at some lesser level of precision. We have prior cases that have said that automating tasks that were performed manually before don't become patent eligible just because the computer does it more efficiently or more quickly, and it seems to me that you have a problem in the sense that avoiding human error, similar to those kind of generic benefits from computerization that we've held, don't make claims patent eligible. I understand the question, but I think that the difference here is that a number of the cases to which you're referring talk about things like implementing a fundamental law of economics, a law of nature, an ordinary means of organizing human activity, and doing so on a computer which does so more efficiently. This is something different because it is an actual application of technology which was done entirely manually before this patent, creating a particular problem that this patent is structured to solve. Isn't it the case that automating any manual process is going to make it less error prone? It may, although some processes are not suitable to automation for a variety of reasons, but in this case it's not just the idea of automation because not every automation is covered by these claims, but it's dealing with particular variables in this art that have been shown, that the specification demonstrates were a particular problem, and I would just point to Washington in particular. And the question is, under McRow, whether there's enough detail provided about how the process is automated, in other words, whether the rules set out in the patent and the claims provide enough detail. And the challengers are always going to argue that there's not enough detail, there has to be more precision in order to be subject matter eligible, but I guess I would analogize to McRow in which they provided types of rules but not rules themselves. In other words, that's why there is not in these claims a discussion of what the washing time should be for one particular type of engine found on one particular type of Boeing or Airbus aircraft, because instead it's talking about the types of rules. As the court said in McRow, accepting the patentee's argument, that was a case in which the rules were going to vary by character. As it sort of colorfully illustrated, a swamp monster, this is a case about animation, a swamp monster was going to use different rules than a tight-lipped cat, and that is why the claims were framed at a greater level of generality, but that was entirely appropriate in that context. We think the same is true here. Again, because this is not an attempt to preempt the abstract idea of washing something according to its type. It is specific to engine type. It is also specific to the type of washing parameters that are appropriate in this art. As I mentioned, Claim 9 is specific to time, but the specification gives some other details about how the control unit takes control of the wash in this context. So you think that on eligibility this is a pure Step 1 analysis? I think that that's right. I think that this can be resolved as Step 1, and I did want to mention the factual context of this case, because Judge Dyke asked my friend whether the facts were in dispute. I think it's important to note that this is not a case in which the Section 101 issue was submitted to the jury for resolution of factual disputes. My friend on the other side never suggested that they had factual disputes that they wanted to take to the jury. They said that Section 101 is a pure question of law, and that they wanted to resolve it to brief it to the court post-trial. But I think that the consequence of that is that they did not make any factual record about what was routine and conventional in the art, except what was submitted at trial, and to the extent that that's in dispute, I think the court has to take that in our favor. Of course, many 101 cases come up to this court pre-trial, but in this post-trial context, I think you have to take either the district court's resolution of it, to the extent that the district court resolves that question. That, of course, would be reviewed for clear error. But to the extent that you're just looking at the evidentiary record, you can't resolve disputed facts in a challenger's favor. What does the term, or what do you understand, the word regulate mean in the claim? Let me answer that in two steps. One, the other side attempted to ask the district court to construe that to mean both regulate and monitor, and the district court rejected that, because monitoring is another embodiment from the specification that the challenger was trying to import into the claim. What we think regulate means, in its plain and ordinary sense, is to perform functions like turn on and off. I think that's illustrated by the passage I pointed to in column 7, line 12, which the control unit directs the opening of one or more of the pumping system. That's the type of activity that regulate encompasses. How is that different than what a human would do? It's certainly true that humans do open the valves when they're washing an engine, but it's the precision of being able to open the valves simultaneously, if necessary, if there's more than one, and also to do so for a very precise time, which a human operator is not necessarily going to be able to do. Of course, it also ensures that, because it's based on the information detector having correctly ascertained the engine type, it's not going to be done incorrectly by a human operator that's gone and gotten a manifold out of a shed and connected it to the engine. It's going to be for the correct parameters loaded in in advance for the correct engine type. Well, manual operators did that too, right? Manual operators selected the engine type. In other words, a manual operator might know the information about what the appropriate parameters for a particular type of engine are. That's correct. If they had it on a wallet card or something, they could do that, but they have to take the right card out, and they have to follow the directions, and they have to do so. Humans are not going to do so with the same degree of precision. That's correct. Okay. Anything further? Not unless the court has any further questions, I know, before my time. Thank you for your attention. Okay. Mr. Weinberg? Thank you, Your Honor. I'd like to just touch really briefly on the 262 patent and then return to the 860. As my friend there said on the other side, the only thing that they're pointing to here is that you can regulate a washing time, turn it on and off more precisely. It's disputed that human operators did regulate washing time. We talked about that on page 29 of our brief, that they, quote, obtained appropriate pressure and flow and keep track of the washing time. That's at Appendix 105. So there's nothing new here. The process being followed by this machine is exactly the same as what's being done by the human operator traditionally. So on the 860, and that's your other question on the 262, I'd just like to clarify that there was no other infringement theory other than this one-particle construction presented to the jury. It seems to be disputed. If you go back to the record and take a look at their expert testimony, that's Appendix 1245 to 1257, you leave no doubt on direct and cross-examination that the only theory of infringement was a one-particle reading. 1255, he says, if you make particles in that range, then you satisfy the limitation. 1253, he says, none of the nozzles tested were devoid of particles in the range. 1255, he says, all you really need to know is that if there is any blue between these two lines, then it satisfies the limitation of the 860 patent. And at cross-examination, we asked him to confirm this.  Question, how about if there's one particle in the range, would that still infringe? His answer is, the way the claim is written, one particle would infringe. Yes, sir, it would satisfy the limitation. And so for Ecoservices to come up here to this court and say that Cash is incorrect and suggests that the infringement theory depends on a single-particle construction, that's not credible. And so Jaymole is appropriate on non-infringement grounds based on that alone. The theory they presented to the jury is just wrong. What evidence did you present that showed that it couldn't infringe? Well, this is under the ordinary meaning, and there was testimony by our expert, Dr. McClough, that 35% was insufficient to wash the fact that this claim language doesn't mean that one particle would infringe. I'm not sure that the expert's testimony was that one particle would infringe. He said that at one point, but then later on in his testimony, he said that in order to effectively wash, you have to either have more particles within that range or wash according to the prior art. So I'm not sure that he was suggesting, really, that one particle would accomplish a washing pursuant to the claims. His direct testimony does suggest that, and we did ask him for that directly, and that's what he provided to the jury. Now, what the claim recites is a specific total volumetric flow, and so presumably, that would be what is required of this claim, a total volumetric flow of 0.5 to 60 liters per minute at the given range of particle sizes. Now, the jury has enough information to conclude, based on that, that what this really means is that the range of particle sizes doesn't really matter so long as you have enough to wash effectively. Now, the reason why that's just wrong is because it takes out all of the parameters that are recited in this patent. What it reduces this patent to is a claim that says, if you shoot enough particles to follow the gas path, you infringe, and these four specific parameters, they don't matter. They mean whatever is required to follow the gas path, and that can't be the correct construction of this claim. This following the gas path is actually a result that's described. It says, whereby... Where in the record below did you precisely make this argument? This argument we didn't have an opportunity to make because this theory was never presented. We had a J-Mall of non-infringement. They argued one particle. We argued that that can't be the case, and they never presented this theory to the district court. You could read the briefing on J-Mall, and so we didn't have an opportunity until this point to say that this is a wrong theory. This is a new theory on appeals. But you were the one who asked about the one-particle concept during the course of the trial. Right. We said it's a one-particle concept. If that's their infringement theory, which is the theory they presented, that is facially wrong, and they admit to that now. They presented no other theory at trial, and so it can't be the case that we would be faulted for not responding to a theory that they didn't raise. We responded to it the very first instance we could, which is in our reply brief to this court because it came out for the first time in their response brief to this court. But their expert testified that 15 percent within this particle size range would be sufficient to clean the engine and that that's what you did, correct? Right. But he testified that 15 percent would satisfy the one-particle construction. That was just an instance of him saying 15 percent meets my definition of infringement. It does not suggest anywhere in the record that he was saying 15 percent would qualify because it's effective or much less that a person of ordinary skill would know how much is effective. There's no testimony of that at all. Their theory here was just that one particle would infringe, and that's not viable, and neither is this new theory in appeal, even if it's considered. The only other theory that was raised to the jury was that perhaps this means that all of the particles or substantially all of the particles should be in the range. The parties agreed there's no infringement under that construction. And so, in the end, Ecoservices had the burden to prove infringement under some theory. It failed to articulate any definite reading of the claim under which its evidence sufficed. It didn't articulate it to the jury, not to the district court, and its new theory here in appeal is not only new, it's wrong, and it's indefinite. And so I don't know on what basis we could have infringement in this case. Okay, anything further? I think we're probably out of time here. I have nothing else, unless you have any further questions, Your Honor. Hearing none, the argument is concluded. The case is submitted. We thank both counsel, and that concludes our session for this morning. Thank you, Your Honor. The Honorable Court is adjourned until tomorrow morning at 10 a.m.